Kottmyer, J.
Introduction
The defendant, Francis Sepulveda (“Sepulveda”), is charged with a series of crimes, including murder. He has moved to suppress statements he made to New York and to Massachusetts law enforcement officers on June 28, 2001. For the reasons which follow, the motion to suppress is denied.
Findings of Fact
On September 11, 1994, a home invasion which resulted in the death of a seven-year-old girl occurred in Lawrence, Massachusetts. Thereafter, a complaint for murder and an arrest warrant issued against Sepulveda.[1] In addition, in 1995 the United States District Court for the District of Massachusetts issued a warrant for Sepulveda’s arrest as a fugitive from justice.
On June 27, 2001, detectives assigned to the New York City Criminal Intelligence Unit (“CIU”) received information that Sepulveda was wanted for homicide in Massachusetts and was working for a tour bus company in New York City using the name Randolph Blyden. At about 11:30 a.m. on June 28, 2001, Detectives Kurt Lindell (“Lindell”) and Teague Ryan (“Ryan”) approached Sepulveda near Rockefeller Center. They identified themselves and addressed him by the name “Francis.” Sepulveda responded: “I knew this was going to happen. I’m glad it’s all over.” The detectives arrested Sepulveda and, together with a Lieutenant Kelly who had arrived at the scene, placed him into a police vehicle. They did not advise Sepulveda of his rights under Miranda v. Arizona, 384 U.S. 436, 478 (1966), and they did not question him. Before Lindell and Kelly got into the vehicle, Sepulveda said to Ryan, “I’ve been waiting a long time for this. I knew it was coming and I’m glad it’s over.”
Sepulveda was transported to the 19th Precinct, which covers the upper east side of Manhattan, by Ryan, Lindell and Kelly.[2] On the way to the precinct, Sepulveda asked whether he was going to do his time in Massachusetts or New York. He expressed fear about jail and said that he was afraid for his life if sent back to Massachusetts. Ryan asked him his name and he responded, “You know what my name is.” He said he wanted to tell the truth about what happened.
Upon arrival at the 19th Precinct, at about 11:50 a.m., Sepulveda was brought to the desk officer who searched Sepulveda and counted and returned his money. He asked Sepulveda questions required for booking and to complete a form entitled “Prisoner Pedigree Card,” e.g., name, address, date of birth, height and weight. The booking sheet (Ex. 2) describes the arrest as “F.O.A. Mass." and refers by number to a warrant issued by the United States District Court for unlawful flight to avoid prosecution for murder, assault and battery by means of a dangerous weapon and armed assault in a dwelling in connection with crimes that had occurred on September 11, 1994, in Lawrence, Massachusetts.[3] The Prisoner’s Pedigree Card states that the primary charge is “F.O.A. Murder I” and describes Sepulveda’s physical/mental condition as “good.” Sepulveda was not offered the use of a telephone.
When the booking procedure was completed, Sepulveda was placed in a holding cell located in the detectives’ area on the second floor. He was the only prisoner in the cell. The cell faces the detectives’ desks. At about 12:15 p.m., Lindell called Detective John McDonald of the Lawrence Police Department and advised him that Sepulveda was in custody. At about 1:15 p.m., Massachusetts State Police Sergeant Mark Lynch called and stated that he and other officers would travel to New York that day. Sepulveda was told that the Massachusetts officers were coming. He said that he wanted to speak with the Massachusetts officers. During the afternoon, Ryan asked Sepulveda whether he wanted anything to eat. Sepulveda said that he did and that “anything” would be fine. Ryan got him a ham sandwich. When Sepulveda indicated that he could not eat ham, Ryan got him a turkey and cheese sandwich, as well as water and cigarettes. Sepulveda was permitted to smoke. He was permitted to use the bathroom.
*233 After Sepulveda had eaten, Ryan took him downstairs to obtain fingerprints via computer imagery for the F.B.I., as well as ink fingerprints. The process took about forty-five minutes. While being fingerprinted, Sepulveda talked about the incident in Lawrence. He told Ryan that he had intentionally remained outside while everything was happening, that the only reason he went back in was because he heard the shots. He said that he saw the little girl shaking and told her to calm down and not to yell, that no one would hurt her and then put the tape back on [her mouth). He said that “it went bad, no-one was supposed to be there,” that he wanted to make it right, do his time and go to college and that he would make things right when he got out. He told Ryan that he was anxious to speak with the Massachusetts officers when they arrived. His statements were not in response to anything said by Ryan. Sepulveda was fully cooperative throughout the afternoon. When speaking with the officers, he was alert and lucid. There was no sign of impairment by reason of drugs or alcohol. After returning to the cell, Sepulveda slept for a while and was sleeping when the Massachusetts officers arrived.
Lindell picked up McDonald and Massachusetts State Police Sergeants John Gavin and Lynch at the airport at 6:20 p.m. and took them directly to the 19th Precinct arriving shortly before 7:00 p.m. When Lynch and McDonald arrived, they went to the cell. Sepulveda smiled when he saw McDonald whom he had known in Lawrence. Detective McDonald, Sergeant Lynch, Detective Ryan and the defendant went into an interview room adjacent to the detectives’ office. The defendant was advised of his rights under Miranda and signed a form acknowledging that he had received and understood his rights shortly after 7:00 p.m. Sergeant Lynch began the interview about 7:10 p.m. and Ryan left the room a few minutes later. Lynch asked questions and wrote down the defendant’s responses. This process continued for about two hours.
At about 9:17 p.m., the officers began to tape record the interview. Sepulveda was again advised of his Miranda rights and asked whether he was willing to talk to the officers. He responded: “I guess I need a phone call before this is all over.” Asked whether he wished to make the phone call “now or after we talk,” he asked to make the call “now before the person goes to sleep.” At about 9:19 p.m., he made two telephone calls (to a person named Iris and to his mother) and the taped interview resumed at 9:29 p.m. Sepulveda answered questions for twenty-seven minutes and the interview concluded at 9:55 p.m. During the interview, Sepulveda was given breaks and permitted to smoke. The entire interview, including breaks, took two hours and forty-five minutes.
Shortly after 10:00 p.m., Sepulveda was taken to 1 Police Plaza where he was held overnight. The following morning, he was brought to court. At about 9:45 a.m. he was arraigned on the charge of being a Fugitive From Justice and waived extradition. Detective McDonald and Sergeant Lynch were present in the courtroom. They took custody of Sepulveda and brought him back to Massachusetts.
DISCUSSION
The defendant has moved to suppress statements he made to Massachusetts and New York law enforcement officers on the grounds: 1) he was not afforded his right to make a telephone call pursuant to G.L.c. 276, §33A; 2) he was not promptly brought before a court; 3) under New York law, he could not effectively waive his Miranda rights unless an attorney was present; and 4) his statements were induced by promises.
1. Extradition Proceedings
Extradition of an accused to another state is governed by Article IV, §2, cl. 2 of the United States Constitution. The extradition clause authorizes a state where the accused committed a chargeable offense to bring an accused to trial in that state. In compliance with this constitutional mandate, numerous states, including Massachusetts (G.L.c. 276, §§11 et seq.) and New York (N.Y. Crim. Proc. §§570.02 to 570.66 (McKinney 2002)), have adopted the Uniform Criminal Extradition Act.
The provisions of the Massachusetts and the New York extradition statutes governing warrantless arrests of fugitives are identical in all pertinent respects. They provide that the accused may be arrested without a warrant when an officer authorized to receive warrants in criminal cases receives information that the accused stands charged in another state with a crime punishable by death or for a term exceeding one year. N.Y. Crim. Proc. Law §570.34; G.L.c. 276, §20B. An accused arrested without a warrant must be brought “with all practicable speed” before a court authorized to issue warrants and a proper complaint on oath must be made. Id.
2. Right to Make a Telephone Call Pursuant to Massachusetts Law
Defendant asserts that he was denied his right under G.L.c. 276, §33A to make a telephone call and that, as a result, any statements he made after he was deprived of that right must be suppressed.[4] The relevant facts are not disputed. The defendant was booked at about 12:00 noon. He was not offered the use of a telephone. New York law does not require that an arrestee be afforded the opportunity to make a telephone call. Sepulveda did not ask to use the telephone. At about 9:20 p.m. after he had given an unrecorded statement to the Massachusetts officers, the defendant asked to use the telephone and he was permitted to make two calls.
G.L.c. 276, §33A states:
The police official in charge of the station or other place of detention having a telephone wherein a person is held in custody shall permit the use of the telephone, at the expense of the arrested person, for *234 the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed forthwith upon his arrival at such station or place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter.
By its terms, the statute applies to officials in charge of places of detention in Massachusetts and does not apply to an individual held in custody in New York.
3. Delay in Arraignment
Under the Uniform Act, as enacted in Massachusetts and New York, a fugitive arrested without a warrant must be taken before a court “with all practicable speed.” G.L.c. 276, §20B; N.Y.Crim.Proc. §570.34. Cases interpreting that language have required that any delay be reasonable in the circumstances. See State v. Hughes, 494 A.2d 85, 89 (R.I. 1985); Commonwealth v. Diggs, 506 A. 2d 431, 435-37 (Pa.Super. 1986). This is the same test that was applied by Massachusetts courts before the Supreme Judicial Court fashioned the so-called “safe harbor” rule in Commonwealth v. Rosario, 422 Mass. 48 (1996).[5]
In Rosario and in Commonwealth v. Butler, 423 Mass. 517, 523 (1996), the Court listed the factors to be considered by a court in making the determination whether a delay in bringing the defendant before the court as required by Rule 7 (A)(1), Mass.R.Crim.P., was reasonable. They are: 1) whether the defendant has been given Miranda warnings; 2) the length of time after arrest before the defendant made incriminating statements; 3) the reasons for the delay; and 4f whether there has been any police misconduct. Id. at 524. Any delay must be evaluated in light of its effect on the voluntariness of statements made by the accused. In certain instances a delay may taint an incriminating statement and call into question whether such a statement was given freely, intelligently and voluntarily. Id. at 525. In addition, flagrant police misconduct must be appropriately sanctioned and a court will order suppression as a deterrent to any such future conduct. Commonwealth v. Rosario, 422 Mass. at 58.[6] “Time alone is not a dispositive factor, but one of the factors in a flexible totality of the circumstances analysis.” Commonwealth v. Butler, supra, 423 Mass. at 524.
The delay in bringing the defendant before the court in this case was not unreasonable. Sepulveda was not interrogated by any police officer before being advised of his rights. He was treated with consideration by the New York officers who provided food, water and cigarettes and allowed him to smoke. He was told that the Massachusetts officers were coming to New York and expressed his willingness to speak with them. He was brought before the court within the time period established by New York law for arrests in criminal proceedings commenced in its courts.[7] The Massachusetts officers were promptly notified of the defendant’s arrest and they went immediately to New York. The Massachusetts officers advised Sepulveda of his Miranda rights immediately. When Sepulveda said that he wanted to make a telephone call, he was permitted to do so. Lastly, the recorded statement is consistent with the officers’ description of the defendant as alert, cooperative and desirous of speaking with the Massachusetts officers.
The defendant argues that this court should apply the rule stated in Rosario and suppress the statements because the defendant was not brought before the court within six hours of his arrest. The governing law is Section 570.34 of the New York extradition statute. There is no basis for concluding that the “safe harbor” rule established in Rosario applies to individuals arrested in another state pursuant to the Uniform Act. Even if the “safe harbor” rule did apply to individuals arrested in Massachusetts pursuant to the Uniform Act, a doubtful proposition, it can have no application to individuals arrested on Massachusetts warrants in other states whose laws and procedures may be and often are different.[8] Massachusetts law enforcement officers have no control over the time at which New York police officers present an arrested person for arraignment.[9] A requirement that officers in the asylum state be familiar with and follow case law and/or statutes governing criminal procedure in the courts of the demanding state would defeat the purpose of the Uniform Act.
4. Admissibility of Statements Made to New York Police Officers
Statements made by Sepulveda to New York police officers include a) statements made to Ryan and Lindell on the street when they approached him;[10] b) statements made to Ryan just after being placed in the vehicle;[11] c) statements made to Lindell, Ryan and Kelly while Sepulveda was being transported;[12] and d) statements made to Ryan while Sepulveda was being fingerprinted.[13] Unprovoked statements, spontaneous in nature, and freely given by the defendant are not the type of statements intended to be protected by Miranda. See Miranda v. Arizona, supra, 384 U.S. at 478. The defendant, in addition to being in police custody, must also be subject to interrogation or its “functional equivalent.” Rhode Island v. Innis, 466 U.S. 291, 300-01 (1980).
The only questions asked by the New York officers were routine booking questions and Ryan’s inquiry as to his name to which Sepulveda responded; “You know what my name is.” A law enforcement officer’s inquiry as to the name of a detained person is not protected by Miranda Routine booking questions including name, age and the like, are not the kind of custodial interrogation with which the United States Supreme Court was concerned in Miranda and are exempt from *235 its rules. Commonwealth v. White, 422 Mass. 487, 500-02 (1996); Commonwealth v. Mahoney, 400 Mass. 524, 528-29 (1987); Commonwealth v. Kacavich, 28 Mass.App.Ct. 941, 941-42 (1990) (rescript). None of Sepulveda’s statements to New York police officers was made in response to interrogation or its functional equivalent and all are admissible under both Massachusetts and New York law.[14]
5. Admissibility of Statements Made to Massachusetts Police Officers
A.Validity of Defendant’s Waiver of Miranda Under New York Law
The defendant argues that under New York law the waiver of his Miranda rights was invalid because he had a right to counsel and counsel was not present when the waiver was given. Under New York law, a defendant’s right to counsel attaches automatically when a criminal action is commenced by the filing of an accusatoiy instrument with a criminal court.[15] People v. Davis, 75 N.Y. 2d 517 (1990); People v. Samuels, 49 N.Y.2d 218, 221 (1980). When that right has attached, a defendant may not waive his Miranda rights unless counsel is present at the time of the waiver. People v. Settles, 46 N.Y.2d 154, 162-63 (1978).
The Commonwealth argues that extradition is a civil proceeding and that the right to counsel had not attached. Judd v. Vose, 813 F.2d 494, 497 (1987); Standen v. Mark, 409 N.Y.S.2d 851 (N.Y.App.Div. 1978). Under New York law, however, Sepulveda’s right to counsel attached when the complaint was issued in Massachusetts. Moreover, New York courts have suppressed statements given by a fugitive from New York to police officers of another state where the fugitive was arrested in that state for purposes of extradition after an accusatory instrument had been filed in New York and the defendant was not represented by counsel at the time he waived his Miranda rights. See People v. Douglas, 472 N.Y.S. 2d 815 (N.Y.Sup.Ct. 1984); People v. Nieto, 746 N.Y.S.2d 371 (N.Y.Sup.Ct. 2002), and cases cited.
B.Law Governing the Admissibility of Statements to Massachusetts Officers
Because under New York law, Sepulveda’s right to counsel had attached and he waived his Miranda rights without benefit of counsel, his statements to the Massachusetts officers would not be admissible in New York. As set forth below, the waiver was valid under Massachusetts law[16] and had the statements been made in Massachusetts, their admissibility would not be in doubt. The issue thus becomes whether the admissibility of the statements in a Massachusetts court is governed by Massachusetts or New York law.[17] The defendant contends that New York law should apply to the admissibility of the statements.
No reported Massachusetts case addressing the issue of choice of law in the criminal context has been found.[18] Of the courts which have considered the issue, some jurisdictions adhere to the choice-of-law analysis traditionally used to resolve conflict issues in civil cases and others apply a so-called exclusionary rule analysis. See generally State of Hawaii v. Bridges, 925 P.2d 357 (1996). In civil cases, Massachusetts courts apply a functional choice-of-law approach, and apply the law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties. Bushkin Assoc., Inc. v. Raytheon Co., 393 Mass. 622, 631-34 (1985). The exclusionary rule analysis looks at the principles which gave rise to the exclusionary rule, judicial integrity and deterrence of police misconduct, and evaluates whether these principles would be served by exclusion.[19] See LeFlar, American Conflicts Law, Setion 116, 324-25 (4th ed. 1986).
It is not necessary to choose between the two approaches in this case, however, because under either analysis Massachusetts law controls the admissibility of the defendant’s statements. New York’s connection with this case is minimal. Further, admission of the statements in evidence in a Massachusetts court will have little, if any, effect on New York’s interest in assuring compliance with its procedures by New York police officers. Although Ryan was present at the beginning of the interview and, in particular, when Sepulveda was advised of and waived his Miranda rights, the interview was conducted by Massachusetts officers and they obtained the waiver. The matter before the New York courts, extradition, was civil in nature. The arrest and detention of fugitives is not governed by New York criminal procedures law generally applicable to criminal cases, but by the Uniform Extradition Act as codified in New York.
In contrast, the crimes were committed in Massachusetts, the defendant and the victims were residents of Massachusetts at the time the crimes were committed, the statements were obtained by Massachusetts law enforcement officers in compliance with Massachusetts law and this criminal case is being tried in Massachusetts courts. Massachusetts has the more significant relationship under general choice-influencing considerations and, because the statements were obtained in compliance with Massachusetts law, their admission in evidence will neither encourage police misconduct nor detract from the integrity of the judicial process. The waiver was valid under Massachusetts law and no practical or institutional purpose would be served by applying New York law.
C.The Validity of the Waiver Under Massachusetts Law and the Voluntariness of the Statements
Under Massachusetts law, the Commonwealth bears the burden of proving that a defendant voluntarily, knowingly and intelligently waived his rights under Miranda. Commonwealth v. Beland, 436 Mass. 273, 279 (2002). Once a Miranda waiver has been established as valid, the court must then examine the *236 defendant’s statements to determine whether, in the totality of the circumstances, they were voluntarily given. Id. The burden is on the Commonwealth to show, beyond a reasonable doubt, that the statements were given voluntarily. Commonwealth v. Lanoue, 392 Mass. 583, 586 (1984), citing Commonwealth v. Tavares, 385 Mass. 140, 145 (1982). Factors a court may consider include, but are not limited to, defendant’s age, education, intelligence, emotional stability, experience in the criminal justice system, physical and mental condition at the time of waiver, details of the interrogation and whether there have been any promises or inducements. Commonwealth v. Beland, supra, 436 Mass. at 279.
The defendant was arrested at approximately 11:45 a.m. He was first given his Miranda rights by the Massachusetts police officers at approximately 7:00 p.m. During the interim seven hours the defendant underwent the usual pre-arraignment processing, including fingerprinting. He was permitted to use the bathroom, and was provided with food, water and cigarettes. He was cooperative and calm. He took a nap. He was not interrogated. On several occasions, he expressed a willingness to speak with the Massachusetts officers. He smiled when he saw Detective McDonald whom he had known in Lawrence. After being informed of his rights by the Massachusetts officers, the defendant agreed to waive those rights and signed a form acknowledging the waiver of those rights. After two hours of questioning, the officers began to record the interrogation. The defendant was again given Miranda warnings. The defendant asked to make a phone call and the officers honored that request. The defendant did not exhibit any signs of intoxication and his speech was clear and lucid. The officers inquired of the defendant whether anyone had-threatened him. The defendant responded: “No, not at all. They’ve been veiy nice to me.” The defendant responded affirmatively when asked if he was speaking of his own free will.
The defendant argues that the Massachusetts officers made promises to him that induced him to make the statements. Specifically, the defendant alleges that he was “promised consideration from the court by the police.”[20] In his recorded statement, the defendant stated that he understood that he would not get a reduced sentence and that “no one promised nothing.” He did state, however, that in response to his question as to what was going to happen to him, he was told that it was not up to the officers, but that “everybody, including the judge is gonna know that you talked to us.” The defendant also stated that he had been told that “it goes in my favor that I say the truth right away,” but acknowledged that the officers had told him that they “couldn’t do anything for you by talking to us” and reiterated that “[n]o one promised nothing.” He concluded that he did not think he would get off light as a result of talking to the officers, but that “it will be a little consideration . . . maybe [from] the judge.” He affirmed that no police officer had told him that his sentence would be reduced if he spoke to the police officers, but that “the judge looks at that with consideration.” The officer responded: “he could look at it with consideration” and the defendant agreed.
“An officer may suggest broadly that it would be ‘better’ for a suspect to tell the truth, may indicate that the person’s cooperation would be brought to the attention of the public officials or others involved, or may state in general terms that cooperation has been considered formally by the courts in the past. What is prohibited ... is an assurance, express or implied, that it will aid the defense or result in a lesser sentence.” Commonwealth v. Meehan, 377 Mass. 552, 564 (1979).[21] The statements in this case did not constitute an assurance, express or implied, that a confession would aid the defense or result in a reduced sentence. See Commonwealth v. Williams, 388 Mass. 846, 855 (1983) (a promise to make defendant’s cooperation in making statement known to district attorney’s office and to the judge not improper); Commonwealth v. Lapke, 13 Mass.App.Ct 24, 33 and n.9 (1982) (statement that if you cooperate it might be favorable to you permissible).
Based on the totality of the circumstances, I find that the Commonwealth has proved beyond a reasonable doubt that the defendant’s waiver of his Miranda rights was knowing, intelligent and voluntary and the statements were made freely and voluntarily.
CONCLUSION
For the foregoing reasons the defendant’s Motion to Suppress Statements is hereby DENIED.

The indictments against Sepulveda were returned in August 2001. The Commonwealth’s Supplemental Memorandum at pg. 3-4 states that a complaint had been filed in Massachusetts before the defendant was apprehended in New York. See also Ex. 6.

As detectives assigned to the CIU, Lindell and Ryan were not assigned to a specific precinct.

It refers to docket no. 95-M0052 LPC and 18 U.S. C. §1073, as well as to “CPLFOA 570-26 of N.Y. Criminal Procedure.” Article 570 of New York’s Criminal Procedure Law codifies the Uniform Criminal Extradition Act.

Although Section 33A does not prescribe a penalty for violation of its provisions, the Supreme Judicial Court has “grafted an exclusionary rule to it” to make the statute an effective piece of legislation. Commonwealth v. Alicea, 428 Mass. 711, 716 (1999). If intentional police conduct deprives a defendant of his statutory right to make a phone call, suppression is required. Id., citing Commonwealth v. Johnson, 422 Mass. 420, 429 (1996).

In Rosario, the Court held that an otherwise admissible statement will not be suppressed because of unreasonable delay in arraignment if the statement is made within six hours of the arrest or the defendant signed a written waiver of his right to prompt arraignment pursuant to Mass.R.Crim.P. 7(A)(1). Statements made-after the six-hour period has expired are inadmissible unless the defendant has executed a waiver of prompt arraignment. Id. at 56.

In Rosario, the Court noted that it was unaware of any reported case in which a statement had been suppressed *237 because of unreasonable delay in arraigning the defendant. Id. at 52.

Under New York law, a defendant arrested without benefit of a warrant must be arraigned without “unnecessary delay.” N.Y.Crim.Proc. §140.20. The New York courts have held that, unless properly explained, a delay in arraignment of more than 24 hours is presumptively unnecessary. People ex rel Maxian v. Brown, 77 N.Y. 2d 422 (1990) (recognizing that the time necessary to process a defendant varies with the circumstances). In any event, except in cases of involuntariness, a delay in arraignment, “even if prompted by a desire for further police questioning” does not automatically warrant suppression of statements or a confession. People v. Ramos, 2002 N.Y. Slip. Op. 07487,750 N.Y.S.2d 821 (2002). The length of the delay and the reasons for the delay are factors to be considered in determining whether the statements were voluntary. Id.

When Rosario was decided, only Pennsylvania and the federal courts had a similar rule. Id. at 55-56.

The Rosario court recognized that the rule would be tolled in certain circumstances. “(I]f for reasons not attributable to the police, such as a natural disaster or emergency, interrogation during the six-hour period is not possible, or must be suspended, the six-hour period- should be tolled appropriately. ”Commonwealth v. Rosario, supra, 422 Mass. at 48. Here, more than six hours had passed before the Massachusetts police arrived at the defendant’s place of detention. The officers made arrangements to travel to New York as soon as they learned that the defendant was in custody. They gave the defendant his Miranda rights and began the interview immediately after arriving at his place of detention. The interview was not unduly long. In Butler, the Court stated that a deliberate decision to delay presentment to interrogate the defendant is not itself fatal. Commonwealth v. Butler, 423 Mass. at 526 and n.9.

“I knew this was going to happen. I’m glad it’s all over.”

 before the officers got into the car, the defendant stated “I’ve been waiting a long time for this. I knew it was coming and I’m glad it’s over.”

On the way to the precinct, Sepulveda asked whether he was going to do his time in Massachusetts or New York. He expressed fear about jail and said that he was afraid for his life if sent back to Massachusetts. Ryan asked him his name and he responded, “You know what my name is.” He said he wanted to tell the truth about what happened.

While being fingerprinted, Sepulveda talked about the incident in Lawrence. He told Ryan that he had intentionally remained outside while everything was happening, that the only reason he went back in was because he heard the shots. He said that he saw the little girl shaking and told her to calm down and not to yell, that no one would hurt her and then put the tape back on [her mouth]. He said that “it went bad, no-one was supposed to be there," that he wanted to make it right, do his time and go to college and that he would make things right when he got out.

See, e.g., Commonwealth v. Byrd, 52 Mass.App.Ct. 642, 644-45 (2001) (spontaneous and incriminating statements made by defendant at the scene of arrest and prior to Miranda warnings, deemed voluntary and admissible even though defendant intoxicated at time of statements); Commonwealth v. Cromwell, 53 Mass.App.Ct. 662, 668 (2002) (defendant’s statement after arrest and upon being placed in police cruiser, “you got me, just take me in,” spontaneous in nature and admissible); People v. Doyle, 709 N.Y.S.2d 57 (N.Y.App.Div. 2000) (spontaneous statement before officer had a an opportunity to give defendant Miranda warnings, admissible); People v. Overby, 674 N.Y.S.2d 339 (1998) (spontaneous statement after evidence found in search incident to arrest and before Miranda warnings, admissible); People v. Torres, 21 N.Y. 2d 49, 54 (1967) (spontaneous statements made while in custody are admissible if not the product of questioning regardless of whether Miranda rights have been given); Commonwealth v. Gonzales, 75 N.Y.2d 938, 940 (1990) (spontaneous statements even after right to counsel attaches admissible if not the result of interrogation).

An accusatory instrument is defined as an information, a simplified information, a prosecutor’s information, a misdemeanor complaint or a felony complaint. NYCPL §105.05. Under New York law, an arrest warrant may not issue until an accusatory instrument has been filed with the court. As a result once an arrest warrant issues, an accused is entitled to counsel and police may not question the accused in the absence of counsel. People v. Harris, 77 N.Y.2d 434, 440 (1991).

In Massachusetts, the filing of a complaint does not trigger the right to counsel. Commonwealth v. Beland, 436 Mass. 273 (2002). Moreover, in Massachusetts, the presence of counsel is not a prerequisite to a waiver of Miranda rights. See id.

As noted above, in similar situations, New York courts have applied New York law.

In Commonwealth v. King, 14 Mass.App.Ct. 982 (1982), statements were given in New York to New York officers. As in this case, the defendant waived his Miranda rights without having counsel present. It is unclear whether the defendant had been charged in Massachusetts. At the time the statements were given the officer told the defendant that the statements would not be admissible in New York courts, and that he did not know if they would be admissible in Massachusetts. The sole issue raised was whether the defendant had been deceived into making the statement. The Court of Appeals held that the waiver was voluntary.
In Commonwealth v. A Juvenile, 396 Mass. 116, 119-21 (1985), the Court held that under the interstate rendition clause of the United States Constitution, the law of the demanding state controls the determination of an offender’s status as a juvenile or adult.

Citing Theis, Choice of Law and the Administration of the Exclusionary Rule in Criminal Cases, 44 Tenn.L.Rev. 1043, 1045 (1977), the defendant argues that the law of the jurisdiction where the conduct took place should determine the legality of the conduct. But that commentary goes on to note that regardless of the legality or the illegality of the conduct at issue, forum states generally do not exclude evidence for violation of non-forum law. Id.

There was no reference to these statements in the testimony at the hearing on the motion to suppress. The tape recording of the interview and a transcription were admitted as Exhibits 5 and 5A. They contain the following references to the subject of the benefit to defendant of speaking with police officers, the only evidence of inducements that was offered at the hearing.
Sgt. Mark Lynch: Is it fair to say that no police officers have threatened you?
Sepulveda: No, not at all. They’ve been very nice to me.
Sgt. Mark Lynch: Okay. Have we promised you anything for talking to us?
Sepulveda: No, you haven’t promised me nothing.
Sgt. Mark Lynch: Okay, okay, so your (sic) doing, your (sic) basically talking to us out of your own free will?
Sepulveda: Yes.
Transcript, pg. 3-4.
Sgt. Mark Lynch: I mean, is it safe to say really, you asked what was going to happen to you?
Sepulveda: Yeah.
*238 Sgt. Mark Lynch: And Jack, Detective MacDonald and I both said that it’s not up to us but everybody, including the Judge is gonna know that you talked to us.
Sepulveda: Right. And that would be towards my, towards my ah, that would favor me, because, I, I. . .
Sgt. Mark Lynch: Who, who said that now?
Sepulveda: Oh, I. . .
Sgt. Mark Lynch: No who, who, did someone tell you that you were gonna be, that you were gonna get, a favor in court cuz you talked to us?
Sepulveda: Um, I spoke to the police officer and he told me um, that if I talk to the the police . . .
Sgt. Mark Lynch: Yup.
Sepulveda: Don’t give them a hard time. Just tell them the truth.
Sgt. Mark Lynch: Okay.
Sepulveda: That I will not get a hard time and it will be done quickly.
Sgt. Mark Lynch: That it will be, we will be done quick with you . . .
Sepulveda: Right. That you would not break my balls, you would ah, go straight and ah, sorry . . .
Sgt. Mark Lynch: No, all I want is the truth here.
Sepulveda: And ah, it goes in my favor that I say the truth right away.
Sgt. Mark Lynch: Okay. When we told, we told you that, am I correct in saying that we couldn’t do anything for you by talking to us.
Sepulveda: Yeah, you told me that.
Sgt. Mark Lynch: Okay. Um, no one promised to do anything for you?
Sepulveda: No one promised nothing.
Sgt. Mark Lynch: Um, do you feel that you are talking to us freely and voluntarily?
Sepulveda: Yes.
Sgt. Mark Lynch: Okay. Do you think your gonna um, get off real light because you talked to us?
Sepulveda: Not light, but it will be a little consideration. "
Sgt. Mark Lynch: Okay from who?
Sepulveda: Maybe the judge.
Sgt. Mark Lynch: Okay. But no police officer has told you that your sentence is gonna be reduced if you talk to us?
Sepulveda: No, what they say is that the judge looks at that with consideration.
Sgt. Mark Lynch: He could look at it with consideration?
Sepulveda: Yeah.
Transcript, pp. 24-26.

 In Meehan, the officer had told the defendant that he could make no promises, but assured him that a confession would probably help your defense.